# UNPUBLISHED CASES

2019 WL 188411
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

Joseph ROBERTS, Individually, and on
Behalf of Those Similarly Situated, Plaintiffs,

v.

INTEGRATED MAIL
INDUSTRIES, INC., Defendant.

Case No. 18-cv-699-pp
|
Signed 01/14/2019

**Attorneys and Law Firms**

Nathan D. Eisenberg, Yingtao Ho, The Previant Law Firm SC, Milwaukee, WI, for Plaintiffs.

Aaron A. DeKosky, Padway & Padway, Milwaukee, WI, for Defendant.

### ORDER REQUIRING PLAINTIFF TO PROVIDE UNREDACTED TELEPHONE RECORDS

PAMELA PEPPER, United States District Judge

**I. BACKGROUND**

**\*1** The plaintiffs' original complaint in this putative class action suit alleged illegal rounding, improper deduction of meal breaks, and unpaid interruption of meal breaks, in violation of the Fair Labor Standards Act (29 U.S.C. § 201, et seq.) and Wis. Stat. § 109.03. Dkt. No. 1. After the court denied the defendant's motion to dismiss, dkt. no. 18, and over a month after the defendant had answered the original complaint, dkt. no. 20, the plaintiffs (timely, by the deadline the court had set) amended the complaint, dkt. no. 23. The amended complaint alleges (in addition to the claims raised in the original complaint), that the defendant also "sometimes adjusted the Plaintiffs' time clock punches because it believed the Plaintiffs were not working for short periods of time during their scheduled work hours." Dkt. No. 23 at ¶17. The plaintiffs assert that the defendant "has never either prohibited its employees from taking short breaks during their scheduled shift times, nor ever informed its employees that they could be disciplined for taking unauthorized short breaks during their shift times." Id. at ¶18. The plaintiffs concluded this allegation by asserting that "between the times when they punched in

and punched out, the Plaintiffs would either walk between the time clock and their work stations or engaged in other work activities for the primary benefit of [the defendant]." Id. at ¶19. These allegations necessarily call into question what the plaintiffs were doing between the punch-in and punch-out times—whether they were, in fact, either walking to/from work stations or engaging in "other work activities for the primary benefit" of the defendant.

On January 11, 2019, the parties contacted the court and indicated that they had a disagreement about a discovery issue. The court was available for a phone hearing when they called. During the hearing, defense counsel informed the court that the defense had made a discovery demand for the named plaintiff's phone records—calls, texts and mobile usage—on November 8, 2018. The named plaintiff had objected unless the parties could hammer out a limited authorization. The parties met and conferred on January 2, but the authorization that resulted did not provide for cell tower site data or data as to the amount of mobile usage. Defense counsel asserted that the authorization also did not provide for the phone records for all the hours that the named plaintiff worked. Finally, the authorization indicated that the service provider would give the records to counsel for the plaintiff first. Defense counsel expressed concern that, with the named plaintiff's deposition scheduled for January 18, 2019, the defense was not going to have the records it needed to be able to depose the plaintiff.

Plaintiff's counsel told the court that the plaintiff did not have access to his records. His service provider was Verizon. Counsel said he was going to have to subpoena the records from Verizon. Defense counsel questioned this assertion, arguing that someone he knew had Verizon as a provider, and that that person could access his mobile records by going to Verizon's web site and entering his user name and password. Nonetheless, the plaintiff's attorney asserted that the plaintiff did not have these records. Counsel stated that the plaintiff was willing to include in the subpoena request a request for cell tower site data and a request for non-data usage record. As for working hours, the plaintiff's counsel said that he was requesting records for usage between the hours of 6:30 a.m. and 8:30 p.m., because the plaintiff would not have been working outside of those hours.

**\*2** Defense counsel interjected that the defendant's records showed some occasions when the plaintiff had clocked in as early as 5:15 a.m., and times when he'd clocked out as late as 10:00 p.m. Plaintiff's counsel responded that that

had been in 2016, and that the plaintiff wasn't seeking damages for that year. Defense counsel responded that the complaint sought damages back to May of 2016. The court interrupted counsels' argument with each other and asked plaintiff's counsel to address the issue of why he was asking to have the documents sent to him first, rather than asking for simultaneous disclosure.

Plaintiff's counsel told the court that originally the plaintiff had agreed that all his phone records could be released to both parties. Four or five days earlier, however, the plaintiff had expressed to his lawyer concerns about his privacy rights. First, counsel said, the plaintiff did not believe that the defendant was entitled to see records of data relating to communications or activities that did not take place during his work hours. Second, the plaintiff had told his counsel that he'd like the chance to see for himself whether any of the communications or activities that had taken place during work hours had been personal; if so, he would concede that they were personal, but he wanted to redact them so that the defendant would not be able to determine the identity of people with whom he'd been communicating, or the nature of what he'd been doing.

The court wondered why, if what the subpoena requested was raw data such as numbers called, numbers calling in, and minutes of data usage, the plaintiff believed that the defendant could find out the identities of people with whom he'd been communicating, or what he'd been doing. Counsel responded that the defendant could conduct reverse look-ups on numbers or conduct other investigations of the raw data.

The court expressed concern that having the records go to the plaintiff for redaction before the defendant could see them would open a can of worms, in which the defendant would (justifiably) question whether the redactions were warranted, and whether the plaintiff may have redacted discoverable information. After some further back and forth, the court told the parties that it would take the issue under advisement but would get them a decision shortly (given the proximity of the plaintiff's deposition).

## II. ANALYSIS

The scope of federal discovery is broad. Federal Rule of Civil Procedure 26(b)(1) allows parties to obtain discovery

regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Rule 26(b)(2)(C) allows the court to limit the extent of discovery only if it is (a) cumulative or duplicative, (b) can be obtained from some other source that is more convenient, less burdensome or less expensive, (c) the party asking for the discovery has had ample opportunity to obtain the information in other ways through discovery, or (d) the discovery is outside the (broad) scope of Rule 26(b)(1).

The defendant's request for the phone records falls well within the scope of Rule 26(b)(1). The phone records are not privileged. They are relevant to the plaintiff's claim that the defendant docked him for personal activity when, in fact, he was either walking to and from his work station or performing work that was "primarily" for the defendant's benefit. The plaintiff already should have access to this information; the defendant does not. (Plaintiff's counsel never explained why the plaintiff could not obtain his own phone records from his own provider through his own account. The court understands that a customer might not be able to get cell tower location data by accessing his online account, but it is not clear why one could not get the list of outgoing and incoming calls by accessing one's account online.) Information about what the plaintiff was doing on his phone during work hours is important in resolving the question of whether, as he has asserted, he was working (or walking to or from his work station) during all work hours. The court cannot see that the phone data is cumulative or duplicative. The least burdensome and expensive way to get the data is to get it from either the plaintiff's own account or from the service provider.

**\*3** So—the defendant is entitled to the records. The only question is whether the plaintiff should get the records first and be able to redact them before forwarding them to the

defendant. The plaintiff has provided only one rationale for departing from the usual simultaneous disclosure practice. The plaintiff has asserted that he has a privacy right in data usage that didn't take place during work hours, and that if he was conducting personal activities on the phone during work hours, he has a right to keep the nature of that activity private.

This argument ignores the fact that it is the *plaintiff* who has put his activities at issue. The plaintiff added these allegations to the amended complaint. It is he who has disputed the defendant's (alleged) belief that the plaintiffs were engaging in personal activities during work hours. The plaintiff cannot have it both ways. He cannot argue that he was not engaging in personal activity during work hours, but demand to be the sole source for determining what activity was personal, and whether it took place during work hours. In fact, during the hearing on January 11, plaintiff's counsel implicitly conceded that the plaintiff may have been conducting personal activity during work hours, by indicating that if the plaintiff reviewed the record and saw personal activities during work hours, he would admit it, but wanted to redact the nature of the activity.

The plaintiff has the right to decide what claims he wishes to put at issue. Once at issue, however, the defense has the right to see what the plaintiff sees in determining whether there are facts to support the plaintiff's claims. The court will not allow the plaintiff to receive and redact the records prior to providing them to the defense. The defense is entitled to the records it has requested, and the plaintiff must turn them over unredacted.

Regarding time frame (whether records from 6:30 a.m. to 8:30 p.m. would cover all hours the plaintiff had worked): In the portion of the December 13, 2018 amended complaint that defines the parties, the plaintiffs are defined as people who were employed by the defendant as hourly employees "during the time period on or after May 4, 2015." Dkt. No. 23 at ¶6. Under the class allegations, the amended complaint defines the putative Rule 23 class as "[a]ll persons who worked as hourly employees for [the defendant] during the time period on or after May 4, 2016." Dkt. No. 23 at ¶31. The court does not know whether one of these dates is a typo—whether the plaintiffs meant May 2015 or May 2016. Either way, the complaint says nothing about limiting damages to 2017 and later. Nor does the complaint explain the significance of the May 4 date or explain when the named plaintiff began working for the defendant.

So—the amended complaint puts at issue phone records for either May 4, 2015 and later, or May 4, 2016 and later. Either way, if in 2015 or 2016 (whichever is the relevant year), the plaintiff clocked in before 6:30 a.m. or after 8:30 p.m., the defendant is entitled to phone records for the entire range of times the plaintiff worked.

As noted above, the parties informed the court that the named plaintiff's deposition was scheduled for this Friday, January 18, 2019. The defendant wishes to have these records available to use during the deposition. The court leaves it to the parties to work together in a professional manner to determine whether the deposition should be rescheduled.

The court **ORDERS** that the plaintiff shall turn over to the defendant his telephone records—including call information, text information, mobile usage, cell tower site data and non-data usage—without redaction. The subpoena (or any other mechanism used to request the data from the service provider) shall call for the information to be provided to both sides simultaneously. The plaintiff shall provide the information for the entire period referenced in the complaint, and for the full range of hours worked from the earliest clock-in time during the relevant period to the latest clock-out time.

**All Citations**

Slip Copy, 2019 WL 188411

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:18-cv-01217-PP   Filed 12/19/19   Page 4 of 21   Document 63-5

Baires Blue Cross Blue Shield of Minnesota v. State Farm..., Not Reported in Fed....

2016 WL 4591905

2016 WL 4591905
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

Elizabeth Moctezuma BAIRES
and Walter A. Baires, Plaintiffs,
v.
BLUE CROSS BLUE SHIELD OF MINNESOTA
and State Farm Mutual Automobile
Insurance Company, Involuntary Plaintiffs,
v.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY Defendant.

Case No. 16–CV–402–JPS
|
Signed 09/02/2016

## ORDER

J.P. Stadtmueller U.S. District Judge

**\*1** The plaintiffs, Elizabeth Moctezuma Baires and Walter A. Baires (the "Baireses"), bring this action against the defendant, State Farm Mutual Automobile Insurance Company ("State Farm") for breach of contract, loss of society and companionship and consortium, and bad faith insurance claims. (Docket #15). Initially, the Baireses filed a motion to compel discovery. (Docket #16). Shortly thereafter, on July 7, 2016, State Farm filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, to bifurcate and stay the proceedings on the bad faith and statutory interest claims. (Docket #26). Because certain arguments in the motion to compel were more fully developed in the motion to dismiss briefing, the Court found it prudent to address these matters together. Both motions are now fully briefed and ready for disposition. (Docket #17, #26, #27, #29, #31, #33). As discussed more thoroughly below, the Court will deny State Farm's motion to dismiss for failure to state a claim, deny State Farm's motion to bifurcate and stay, and will grant the Baireses' motion to compel.

## 1. FACTUAL BACKGROUND [1]

This action arises out of an insurance dispute between the parties. Elizabeth Moctezuma Baires was injured in an automobile accident on September 2, 2010. (Am. Compl.

¶ 7). The accident was caused by the negligence of Eric Steele ("Steele"). (Am. Compl. ¶¶ 6–8). At the time of the accident, Steele was insured by American Family Mutual Insurance Company ("American Family"), under a policy that had $100,000.00 limits. (Am. Compl. ¶ 9). At the time of the accident, the Baireses were insured by State Farm. (Am. Compl. ¶ 5).

On or about March 26, 2014, American Family tendered the sum of $100,000.00 to Ms. Baires and State Farm authorized her to accept the offer. (Am. Compl. ¶ 11). The Baireses allege that the liability limits under the American Family policy, however, were inadequate to make them whole from the injuries and damages arising out of the accident. (Am. Compl. ¶ 10).

The Baireses' insurance policy with State Farm provided underinsured motorist benefits ("UIM"). (Am. Compl. ¶ 5). Ms. Baires provided State Farm with medical records and reports documenting the significant and permanent injuries and the need for ongoing medical care; she then requested that State Farm pay its UIM limits. (Am. Compl. ¶ 12). State Farm declined to pay the amount demanded by Ms. Baires. (Am. Compl. ¶ 13). State Farm offered only $40,000.00 in UIM benefits. (Am. Compl. ¶ 12). On December 24, 2015, State Farm sent a letter to the Baireses in response to the their further request for UIM benefits. (Am. Compl. ¶ 13). State Farm admitted it has "a business practice in place where [it] would advance [its] initial offer when settlement negotiations failed," but State Farm nonetheless failed to pay to $40,000.00 or any other benefits owed to the Baireses. (Am. Compl. ¶ 13).

**\*2** The Baireses initially brought suit in Milwaukee County Circuit Court, and, on April 1, 2016, State Farm removed the case to this Court. (Docket #1). On June 16, 2016, the Baireses amended the original complaint to add a claim for bad faith. (Docket #15).

## 2. MOTION TO DISMISS

State Farm argues that the Baireses' claim for bad faith must be dismissed for the failure to state a claim. (Docket #2–6). "A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 736 (7th Cir. 2014). When reviewing a complaint, the Court construes it in the light most favorable to the plaintiff, accepts as true all well-pleaded facts alleged, and draws all reasonable inferences in the plaintiff's favor. See Foxxy

*Ladyz Adult World, Inc. v. Vill. of Dix, Ill.*, 779 F.3d 706, 711 (7th Cir. 2015).

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)); *see Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 526 (7th Cir. 2015) (explaining that a plausible claim need only " 'include enough details about the subject-matter of the case to present a story that holds together.' ") (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014)). Thus, a plausible claim is one with "enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations." *Twombly*, 550 U.S. at 556.

To state a plausible claim, a plaintiff is not, however, required to plead specific or detailed facts, *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), nor does the plausibility standard also "impose a probability requirement on plaintiffs: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely.' " *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013) (quoting *Twombly*, 550 U.S. at 556); *see Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1099 (7th Cir. 2015) ("In deciding or reviewing a Rule 12(b)(6) motion, [courts] do not ask did these things happen; instead, the proper question to ask is still *could* these things have happened.") (internal quotations omitted). And, there is also no requirement that plaintiffs must state in their complaint "all possible legal theories." *Camasta*, 761 F.3d at 736 (citing *Dixon v. Page*, 291 F.3d 485, 486–87 (7th Cir. 2002)); *see Runnion*, 786 F.3d at 517 (finding a lower court's conclusion that an amended complaint must allege "facts supporting specific legal theories [to be] problematic, to say the least"). "A court may dismiss a complaint [for failure to state a claim] only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

The tort of bad faith is a separate intentional wrong which results from a breach of a duty imposed by a contractual relationship. *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 687, 271 N.W.2d 368 (1978). It is not a tortious breach of contract. *Id.* The Wisconsin Supreme Court has recognized bad faith claims to help "redress a bargaining power imbalance between parties to an insurance contract." *McEvoy v. Group Health Coop. of Eau Claire*, 213 Wis.2d 507, 518, 570 N.W.2d 397, 402 (1997).

**\*3** To recover on a claim for bad faith, a plaintiff must prove: (1) "the absence of a reasonable basis for denying benefits"; and (2) the insurance company's "knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.* at 691. If the duty to pay is "fairly debatable," that is, if the company has investigated and developed the facts necessary to evaluate the claim, and has not recklessly ignored or disregarded the facts necessary to evaluate the claim, the company is entitled to argue that its decision to deny benefits is fairly debatable. *Id.* However, if the company knowingly fails "to exercise an honest and informed judgment," such failure "constitutes the tort of bad faith." *Id.* at 692.

As to the bad faith claim, the Baireses' amended complaint alleges the following:

> That State Farm knew it had no reasonable basis for denying UIM benefits; and that State Farm's conduct as set forth herein and including denying UIM benefits and forcing the plaintiffs to file a lawsuit to obtain any UIM benefits was intentional and was done solely to protect its own business interests.

(Am. Compl. 20, Docket #15). State Farm argues that these allegations fail to state a claim for two reasons: (1) the Baireses plead themselves out of court by attaching exhibits that contradict the complaint allegations; and (2) that the allegations are too conclusory to state a claim for bad faith.

Here, the Court finds that the amended complaint sufficiently states a claim for bad faith. The Baireses' complaint included a letter from State Farm detailing State Farm's reasoning for denying the insurance claim.[2] The letter generally explains that State Farm denied the claim because Ms. Baires was made whole by American Mutual's payment of $100,000.00 (*see* Docket #1–1 at 13). As such, State Farm argues that the letter contradicts the Baireses' assertion that State Farm had no reasonable basis for denying the claim.

State Farm is correct that generally "when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations," *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998). However, as the Seventh Circuit further explained in *Northern Indiana*, the Court must carefully scrutinize the tension between the allegations in the complaint and the exhibits attached to the complaint. *Id.* 454–55 ("Rather than accepting every word in a unilateral writing by a defendant and attached by a plaintiff to a complaint as true, it is necessary to consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents.").

In applying this rule, the Court finds that the attached letter does not inherently contradict the allegations of bad faith in the amended complaint. Although State Farm's letter undoubtably provides a reason for denying the Baireses' insurance claim, the reliability of the letter is questionable at this early stage in the litigation. *Id.* at 456 "(Even though [the] letters include statements that stand in direct opposition to [the] allegations, it would be unwise to accept these unilateral statements as explaining the entire story at this early point in the litigation."). State Farm's letter may be self-serving and, therefore, does not provide a reliable basis for contradicting the allegations of bad faith. Indeed, one cannot imagine that an insurance company would readily admit to having no reasonable basis for denying an insurance claim. State Farm's position that it had a reasonable basis for denying the claim may or may not be true; the Court makes no determination at this early stage as to the merit's of this claim. As such, the Court finds that State Farm's letter does not inherently contradict the Baireses' bad faith allegations such that they have plead themselves out of court.

 **\*4** Finally, the Court rejects State Farm's argument that the allegations in the amended complaint are too conclusory to state a claim for bad faith. To begin, State Farm offers not a single authority to suggest that a bad faith claim requires more factual detail to sufficiently state a claim. The Court fully recognizes that the Baireses' allegations are fairly conclusory because they do not include any specific detail as to why State Farm had no reasonable basis to deny the claim. However, notice pleading "do[es] not require a claimant to set out in detail the facts upon which he bases his claim." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)(internal quotes omitted). The Baireses allege that State Farm had no reasonable basis to deny their claim for the full amount of

their UIM insurance. Whether or not the Baireses will be able to prove this allegation through discovery is an entirely different question. However, the Court cannot say that it is clear that no relief could be granted under *any set of facts* that could be proved consistent with the allegations. *Hishon*, 467 U.S. at 73. As such, the Court will deny State Farm's motion to dismiss for the failure to state a bad faith claim.

### 3. MOTION TO BIFURCATE AND STAY
State Farm alternatively requests to bifurcate and stay the bad faith and statutory interest claims.[3] (Docket #26 at 6). State Farm argues that: (1) the Baireses cannot make the threshold evidentiary showing necessary to obtain bad faith discovery; and (2) bifurcation is necessary to protect State Farm's interest to eliminate the potential jury confusion and prejudice and to promote judicial economy. (Docket #26 at 6). For the reasons that follow, the Court will deny the motion to bifurcate and stay.

Although this action involves questions of state law, federal procedural law applies to the issues of bifurcation and stay. *See Klonowski v. Int'l Armament Corp.*, 17 F.3d 992, 995 (7th Cir. 1994) ("As a federal court sitting in diversity, we apply Wisconsin state law to resolve the substantive questions concerning the accident and federal law on any procedural and evidentiary issues."). Pursuant to Federal Rule of Civil Procedure 26(d)(2), this Court may sequence discovery in phases "for the parties' and witnesses' convenience and in the interests of justice." Under Federal Rule of Civil Procedure 42(b), the Court may conduct separate trials of separate claims. Together, these rules confirm that the court has the discretion to bifurcate and stay certain issues for a later phase of discovery or trial. *See McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 870 (7th Cir.1994).

The Court recognizes that Wisconsin courts have found appropriate the bifurcation of a bad faith claim from a coverage claim and a stay of discovery on the bad faith claim. *See Brethorst v. Allstate Property & Casualty Insurance Co.*, 2011 WI 41, 334 Wis.2d 23, 798 N.W.2d 467; *Dahmen v. American Family Mutual Insurance Co.*, 2001 WI App 198, 247 Wis.2d 541, 635 N.W.2d. 1. However, these cases are not controlling as to federal procedure and, more importantly, the Court disagrees with the reasoning of both cases. Instead, the Court aligns with District Judges Clevert and Adelman and Magistrate Judge Crocker in *Fiserv Sols., Inc. v. Westchester Fire Ins. Co.*, No. 11–C–0603, 2012 WL 2120513, at \*1 (E.D. Wis. June 11, 2012), *Ingram v. State Farm Mutual Automobile*

*Ins. Co.*, No. 10C1108, 2011 WL 1988442 (E.D. Wis. May 19, 2011), and *Eide v. Life Ins. Co. of N. Am.* No. 09–cv–671–slc, 2010 WL 1608658 (W.D. Wis. Apr. 19, 2010), respectively.

To begin, this Court takes very seriously its obligation to comply with Federal Rule of Civil Procedure 1 requiring the rules to be construed and administered "to secure the just, speedy, and inexpensive determination of every action and proceeding." Allowing a stay and bifurcation in this instance would not further this goal. Further, the Court finds it likely that "there will be significant overlap between the claims such that it would be wasteful to take a piecemeal approach to discovery." *Ingram,* 2011 WL 1988442 at *1; *accord McLaughlin v. State Farm Mutual Automobile Ins. Co.*, 30 F.3d 861, 871 (7th Cir. 1994) (noting that evidence relating to compensatory claim and bad faith claim "usually overlaps substantially"). As such, the Court finds that any prejudice to State Farm from having to disclose internal documents from its claim file is outweighed by the time and money saved by allowing discovery on all issues to proceed simultaneously.

**\*5** In light of the foregoing, the Court will exercise its discretion and deny State Farm's motion to bifurcate and stay the bad faith and interest claims.

## 4. MOTION TO COMPEL

The Baireses filed a motion to compel discovery pursuant to Federal Rule of Civil Procedure 37(a). (Docket #16). The Baireses' interrogatories and requests for production at issue seek information regarding: (1) adjusters or other persons who handled or reviewed the plaintiffs' UIM claims (Interrogatory No. 9); (2) training materials used to evaluate the plaintiffs' UIM claims (Interrogatory No. 10); (3) reserves set on the Baireses' UIM claims (Interrogatory No. 17 & Request No. 11); (4) State Farm's claims file on the Baireses' UIM claims (Request No. 1); (5) written evaluations of at-fault driver's liability and plaintiffs' damages (Request No. 3); (6) Claim Procedures Guide/other documents used to evaluate the Baireses' claims (Request No. 13); and (7) documents relating to Xactiamte, Colossus, or any other computer based software estimators used to evaluate the Baireses' claims. (Request No. 14) (Thomsen Aff., ¶¶ 2–3, Exhs. 1–2, Docket #30).

Under Federal Rule of Civil Procedure 26(b)(1), parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) The information sought need not itself be admissible to be discoverable. *Id.*

A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or has provided evasive or incomplete responses. Federal Rule of Civil Procedure 37(a)(2)–(3). The burden "rests upon the objecting party to show why a particular discovery request is improper." *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 235 F.R.D. 447, 449–50 (N.D. Ill. 2006). The objecting party must show with specificity that the request is improper. *Graham v. Casey's General Stores*, 206 F.R.D. 251, 254 (S.D. Ind. 2002). That burden cannot be met by "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." *Burkybile v. Mitsubishi Motors, Corp.*, 2006 WL 2325501 at *6 (N.D. Ill. Aug. 2, 2006) (internal quotations and citations omitted). Rather, the court should consider "the totality of the circumstances, weighing the value of material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (quoting *Rowlin v. Alabama*, 200 F.R.D. 459, 461 (M.D. Ala. 2001)).

Here, the Court finds that State Farm has failed to meet its burden to show why the Baireses are not entitled to the requested discovery. State Farm's objections to the discovery requests are nothing more than boilerplate objections that provide no specific reasons as to why the requested discovery is improper. Boilerplate objections such as relevancy and "not proportional" will not overcome this burden. Moreover, State Farm's opposition to the motion to compel is wrought with conclusory statements that add little to the analysis. First, State Farm argues that the requested discovery is not relevant to the breach of contract claim. But, rather than explain *why* the specific discovery requests are not relevant as to each item, State Farm summarily argues that this issue is not a pure breach of contract claim (oddly, however, State Farm did not bring a motion to dismiss for the failure to state a claim for breach of contract). (*See* Docket #27 at 14) ("this is an action authorized by contract, not an action for breach of contract, because, quite simply, neither party has breached the contract"). State Farm finishes this argument with the conclusory statement that "in no way are the discovery demands proportional to the needs of the contract claim." (Docket #27 at 15). Similarly, rather than explain *why* the requested discovery is irrelevant or not

proportional to the bad faith claim, State Farm instead rests its argument on the Baireses' failure to state a claim for bad faith. As discussed above, the Court has rejected this argument. [4]

**\*6** As the objecting party, State Farm had the burden of proving with specificity why the requested discovery is improper. State Farm has not come even close to meeting that burden. As such, the Court will grant the Baireses' motion to compel in its entirety. To the extent there are *specific* issues that remain as to the requested information, the Court will certainly entertain those issues should they arise. However, the Court cautions the parties that further discovery disputes that lack specific objections to the requested information may result in monetary sanctions.

### 5. CONCLUSION

As discussed above, the Court finds that the amended complaint sufficiently states a bad faith claim and that bifurcation and a stay of the bad faith and statutory interest claim are not warranted. The Court further finds that the Baireses are entitled to their requested discovery because State Farm has failed to prove why the discovery is improper. In light of the foregoing, the Court will: (1) deny State Farm's motion to dismiss the bad faith claim; (2) deny the alternative request to bifurcate and stay the bad faith and interest claims; and (3) grant the Baireses' motion to compel.

Accordingly,

**IT IS ORDERED** that State Farm's motion to dismiss or in the alternative to bifurcate and stay the bad faith claim (Docket #25) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that the Baireses' motion to compel discovery (Docket #16) be and the same is hereby **GRANTED**.

### All Citations

Not Reported in Fed. Supp., 2016 WL 4591905

---

Footnotes

1    The Court notes that, at the motion to dismiss stage, the Court "take[s] as true all well-pleaded facts alleged in the complaint..." *Tamburo v. Dworkin,* 601 F.3d 693, 700 (7th Cir. 2010). As such, all facts, unless otherwise noted, are taken from the amended complaint (Docket #15).

2    The Court notes that the Baireses did not attach this letter to the amended complaint, however, it was attached to the original complaint. (*Compare* Docket #1 *with* Docket #15).

3    The Court notes that the amended complaint alleges three claims: (1) breach of contract; (2) loss of society and companionship and consortium; and (3) bad faith. (Docket #15). The statutory interest claim is requested as a form of relief. (Docket #15 at 8).

4    Counsel for the Baireses, Mark Thomsen, submitted a declaration to certify that the parties were unable to reach an accord regarding the discovery dispute. (Docket #20). The Court recognizes that the Baireses added the bad faith claim only one day prior to filing the motion to compel discovery. (*See* Docket #15, #16). Mr. Thomsen submitted emails between the parties detailing their discovery dispute following the filing of the amended complaint. (Docket #20–5). In normal circumstances, the Court would expect parties to allow more time for State Farm to have considered the discovery request in light of this new claim. However, in this case, dispositive motion deadlines are quickly approaching and State Farm has offered no specific reasons to object to the requested discovery. As such, the Court is sufficiently satisfied that the motion to compel was warranted at the time it was filed.

---

**End of Document**                           © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6694904
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

BANKDIRECT CAPITAL FINANCE, LLC, Plaintiff,

v.

CAPITAL PREMIUM
FINANCING, INC., Defendant.

No. 15 C 10340
|
Signed 11/08/2018

**Attorneys and Law Firms**

Kerry Evan Saltzman, David B. H. Williams, Mitchell Bryan, Williams, Bax & Saltzman, P.C., Sean W. Gallagher, Wesley A. Morrissette, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, for Plaintiff.

Justin A. Barker, Brendan Edward Ryan, Mark William Premo Hopkins, Timothy William Knapp, Casey James McGushin, Kirkland and Ellis LLP, Chicago, IL, for Defendant.

**REPORT AND RECOMMENDATION**

Jeffrey Cole, UNITED STATES MAGISTRATE JUDGE

**Introduction**

*1 Defendant, Capital Premium Financing, Inc., has filed a second motion before Judge Lee, seeking imposition of discovery sanctions for claimed violations by BankDirect Capital Finance, LLC and Texas Capital Bank. (collectively "BDTCB"). The Motion asked the court to dismiss BankDirect's claims and enter a default judgment against BankDirect and in favor of Capital Premium on Capital Premium's claims. In the alternative, Capital Premium asks for a mandatory adverse inference against BankDirect and Texas Capital Bank, and for the two to complete their discovery obligations under the supervision of a third party at their own expense. BDTCB's response to the motion insists that none of the claimed discovery violations or the claimed violations of court orders are BDTCB's fault. Consequently, they argue, imposition of sanctions would not

be appropriate. Judge Lee has sent the motion here for a Report and Recommendation.

In the view of BDTCB, all they wanted was for the plaintiff to pay the $400 filing fee, file the 40-page Complaint (with 750 pages of exhibits) against a former business partner, Capital Premium, and, if everything went smoothly, take it over. [Dkt. # 1]. But things seldom go as we would like. Especially in complex litigation. They certainly did not here. Right off the bat, the Complaint was dismissed for lack of jurisdiction. [Dkt. #8]. An unfortunate beginning that ultimately was repaired. [Dkt. #89]. Actually, *four* versions of the Complaint were required. [Dkt. ##1, 9, 40, 160]. But then Capital Premium filed a Counterclaim (two more versions would ultimately be filed). [Dkt. #27]. So now, BankDirect is not just a plaintiff, but a defendant, as well.

In a case that eventually needed seven sets of pleadings, it ought to come as no surprise that a substantial effort was involved in working out a discovery schedule, and even more was required to get discovery rolling. [Dkt # 62, 64, 71, 142]. Capital Premium had difficulties handling e-discovery and asked for an extension, which was unsuccessfully opposed, and the extension was granted. [Dkt. ##68, 71, 72]. BankDirect's motion for partial summary judgment was denied. [Dkt. # 78]. Capital Premium moved for a preliminary injunction, which it won. [Dkt. ##89, 164]. Capital Premium filed its own motion for summary judgment, and although it was stricken, BDTCB nonetheless had to go through the substantial effort of briefing it. [Dkt. #201]. And, as it is alleged in the response to Capital Premium's sanctions motion, briefing is time-consuming. [Dkt. # 328, at 7-8]. But it is for everyone involved in modern, complex litigation.

All along, BDTCB laments it had to participate in time consuming discovery.[1] Not surprisingly, it was "arduous" [Dkt. # 328, at 1] – and expensive. *Helping Hand Caregivers, Ltd. v. Darden Restaurants, Inc.*, 900 F.3d 884, 891 (7th Cir. 2018); *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 297 (1st Cir. 2001). But it always is. It is "the bane of modern federal litigation." *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 542 (7th Cir. 2000). Sadly, pre-trial discovery under modern federal practice has become a monster on the loose; "[p]re-trial proceedings have become more costly and important than trials themselves." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1013 (4th Cir. 1986). *See also Bond v. Utreras*, 585 F.3d 1061, 1067 (7th Cir. 2009); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir.

1998). That seems to be the case here. In any event, it is not a legitimate excuse for what has occurred in this case.

**\*2** Not surprisingly, the judge and the magistrate judge insisted, among other things, that there be compliance with Local Rule 37.2 and that conferences over discovery disputes be conducted in "good faith." [Dkt. # 328, at 14] – precisely as common sense and every relevant discovery case ever decided requires. [Dkt. #328]. Of course, to use the plaintiff's words, discovery required "agonizing persistence." [Dkt. # 328, at 5]. Parties more often than not have to put up with "granular inquiries" from opponents. [Dkt. # 5]. The plaintiff claims to be a good deal more focused than the defendant – "painstaking[ ]" is the word they use – than the defendant. But that claim is simply not persuasive. Nor is the claim that BDTCB's supposed punctiliousness has resulted in their not having produced as many documents as would otherwise be required. [Dkt. #328, at 5, 8].

Also, BDTCB insists that while they were trying to keep up with discovery, they had to do "extensive briefing" in motion practice, including defending against their opponent's first sanctions motion, which, contrary to their opponent's first sanctions motion, which, they contend, unfairly targeted them for mere technical problems in discovery that it is claimed could not be helped. [Dkt. #328, at 7-8]. Given all that, BDTCB insists they ought not be blamed for any "shortcomings" [Dkt. # 328, at 1] – or for "imperfections, mistakes and delays" [Dkt. # 328, at 1] – or for "unfortunate oversight[s]" [Dkt. # 328, at 10], "technical problems" [Dkt. # 328, at 7], or "deficiencies." [Dkt. # 328, at 12]. BDTCB insists it should not be blamed for TCB's CEO failure to suspend automatic deletion of years' worth of seemingly relevant emails. After all, the President of the Bank was not concerned about it because, as he claimed, quite unconvincingly, he didn't think "there would[ ] have been any emails that were problematic during that period of time...." [Dkt. # 229, at 9-10]. Is it BDTCB's fault that BankDirect's IT department can't input the right dates into a document search or doesn't know how to use quotations marks in a search? [Dkt. # 328, at 7]. Ignored is the fact that BDTCB, during the course of this case, was represented by respected and significant law firms that proudly boast to having a national reputation and a national clientele.

As far as BDTCB is concerned, Capital Premium's recent motion is, "excessive", "drastic", "unfair[ ]", "overstate[d]", and "histrionic[ ]." [Dkt. # 328, at 1, 8, 12]. It is, BDTCB insists, even more contrived and unfair than the first one Capital Premium filed, which we resolved against BDTCB.[2]

Judge Lee has sent the matter here for another Report and Recommendation.

## ARGUMENT

On April 4, 2018, I entered a Report and Recommendation on Capital Premium's motion for sanctions due to claimed spoliation of evidence. While Capital Premium asked for default judgment, I stopped short of recommending that measure and recommended other alternatives. [Dkt. #229]. *See BankDirect Capital Fin., LLC*, 2018 WL 1616725, at \*2. While Capital Premium filed an objection, it only took issue with the ultimate recommendation. [Dkt. #234]. Both the Report and Recommendation – which, contrary to Capital Premium's characterizations, is not an Order and could not have *imposed* any sanctions as it is a nullity until *de novo* review, 28 U.S.C. ¶ 636(b)(1)(B); *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 869 (7th Cir. 1996) – and Capital Premium's objections are pending before Judge Lee. In this second Report and Recommendation, I address only what has gone on while the first Report and Recommendation has been pending.[3]

### A.

**\*3** The first Report and Recommendation regarding sanctions due to claimed spoliation of evidence by the plaintiff was entered April 4th of this year. Around the same time, an ongoing – long ongoing – dispute between the parties over Capital Premium's Second Set of Document Requests was finally coming to a head. Among the sticking points were Requests 8 and 9, which BDTCB had been all but ignoring since Capital Premium served them on August 22, 2017. The Order that I entered concluded that dispute and provided the details of BDTCB's recalcitrance. [Dkt. #271]. Those details need not be revisited at length here. Suffice it to say that BDTCB missed multiple deadlines, engaged in its own private stay of discovery, lied to opposing counsel, and made representations to the court that were difficult to believe. They were ordered to produce the documents at issue by August 10, 2018. Notably, BDTCB never objected to that Order detailing its discovery violations as being clearly erroneous under 28 U.S.C. ¶ 636(b)(1)(A); Fed.R.Civ.P. 72(a). BDTCB does, however, congratulate itself on producing the documents at issue by the August 10th deadline, and thereby not violating

a court Order. [Dkt. #328, at 8]. But this was a year after the initial discovery request.

Then there was the odyssey BDTCB took Capital Premium and the court on regarding an August 2017 discovery request for communications BankDirect had with certain insurance agencies. It is depicted in greater detail in yet another discovery Order issued in August 2018 [Dkt. # 271], so the details need only be briefly discussed here. *See BankDirect Capital Fin., LLC*, 326 F.R.D. 171. The parties haggled for a couple of months until, in November 2017, Capital Premium provided BankDirect with a pared down list of insurance agencies. But, rather than getting the list to their client so a search could begin, BankDirect's counsel inexplicably held onto the list for three weeks, filed a motion to stay discovery and, while it was pending, instituted their own private stay of discovery. [4] When Judge Lee denied the motion for a stay in January 2018, BankDirect finally promised to produce the communications within 21 days. BankDirect then essentially ignored that deadline and promised to provide the communication by March 12th and then March 19th. On March 21st, however, counsel for BankDirect astonishingly informed Capital Premium that BankDirect wouldn't be producing anything. After nearly a year of recalcitrance and delay, a court Order was necessary to hold BankDirect to its word to its discovery obligations. [Dkt. #271].

Beyond that, and also since the April 4th Report and Recommendation, I twice ordered BDTCB to produce responsive materials: the first time was on May 8th. [Dkt. #241] ("Plaintiff is to produce by May 18 the agreed upon documents from Capital's second set of document requests"). And the second Order was on May 24th, when BDTCB missed the May 18th deadline. [Dkt. #252]. That Order stated: "Telephonic discovery conference held. It was reported to me that BankDirect has still not produced documents it was obligated to produce by May 18, 2018 .... The request of BankDirect's lawyer for additional time to produce materials that had been ordered produced by May 18 is granted but only until June 6, the date by which production must be made. No objections to production of the overdue documents will be entertained."

For some reason, BDTCB is of the opinion that it is a mischaracterization to say that they did not comply with the discovery Orders because they came after a lengthy process of addressing BDTCB's objections and multiple court interventions. [Dkt. #328, at 6]. But, by May 2018, the time

had long since passed for BDTCB to produce the pertinent documents or, at the very least, start searching for them. More importantly, the fact that the initial discovery request had to be pared down is no excuse to ignore court ordered deadlines that issue once that paring is completed.

**\*4** When one looks at the repeated and numerous excuses that BDTCB has given for its chronic and repeated failures in discovery in this case, one is struck by the sheer number of the omissions and stalls that have continually occurred. Of course, discovery is difficult and from time to time the constraints imposed on one party or another – or sometimes both – are rigorous. That is simply the nature of the mechanism that Congress has chosen to replace the so-called "sporting theory of justice." [5]

Court-ordered deadlines aside, BDTCB had promised to produce the documents by April 27th, and when it couldn't manage that, by May 4th. It didn't fulfill either of those promises, and, in reality, it didn't even run a search until April 26th. [Dkt. #282-3]. According to a letter from BDTCB's counsel to counsel for Capital Premium, the whole process proved to be "cumbersome" and took over a month and, seemingly, ten tries. At one point, in early May 2018, the client's IT department limited the search to the wrong time period. The next time the client tried wasn't until May 31, 2018, at which point it purportedly used quotation marks as an item to search rather than employing them as a search logic marker. [Dkt. ##282-3, 328, at 7].

Electronic searches, of course, are only as accurate as the individuals creating and performing them are knowledgeable and careful. Such searches are, without a doubt, beyond the ken of many. But, BankDirect tells us it is one of the top commercial insurance premium finance companies in the nation. [Dkt. # 160, ¶ . 23]. Yet it also tells us that its IT department could not properly employ quotation marks in a search or input the proper dates due to its technological limitations. [Dkt. #328, at 2]. But if one is an IT expert, one's limitations in this arena should be apparent and known. This is especially the case where the gaffs occurred in the wake of BankDirect's owner and co-counterdefendant, TCB, being found to have destroyed years of emails, supposedly because of ineptitude. [Dkt. # 229, at 9-10]. That ought to have put counsel and client on their most careful behavior, but it clearly didn't.

When the June 6th deadline came, BDTCB produced just three documents. The reason for the paltry production – apparently – was that, after all that, the parties had become embroiled in a dispute within a discovery dispute within a dispute over what search terms BDTCB ought to have applied. [Dkt. #254]. There were no documents from TCB. [Dkt. ##328, at 9; 334, at 2]. The parties were ordered to meet and confer and to attempt in good faith to resolve the dispute by June 25th.

On June 6th, BDTCB wrote a letter summarizing their efforts to comply with outstanding discovery requests and results of those efforts. Among other things, the letter assured Capital Premium that BDTCB had failed to locate any documents responsive to requests 6, 40, and 42. [Dkt. #282-4]. But, after that letter – and more importantly, after the court ordered the June 6th deadline – BDTCB produced a trickle of documents responsive to all three requests. [Dkt. ##281-2, 281-7, 281-9, 281-10, 281-11]. Remarkably, as of July 27th, a letter from BDTCB's counsel to Capital Premium's counsel indicated that, over a month and a half after the June 6th deadline, documents were still being collected and searched [Dkt. #282-12], as though no court Order or deadlines ever existed. TCB, for its part, tells us in the response brief to the sanctions motion that it will finally produce documents – responsive to an August 2017 request – by October 29, 2018. That's just two weeks before the close of fact discovery. Again, slow starts and slow processes yielded bad results.

**\*5** But, slow and late is the BDTCB way in this case. Just a couple of months ago, in August 2018, BDTCB was still producing documents in response to Capital Premium's first set of document requests which were served in February 2017; documents that were due to be produced in March 2017. Among this trickle of discovery were documents that, at a glance, were clearly relevant to this case and responsive to Capital Premium's request. [Dkt. ##281-3-281-6]. For example, the late production includes documents such as a presentation BankDirect put together for Capital Premium during the parties' negotiations that describes the essence of their deal – the deal that this case is all about. [Dkt. ##281-3-281-5]. The production also included documents detailing BankDirect's thoughts during negotiations [Dkt. #281-6], and documents pertaining to BankDirect's analysis of Capital Direct's performance during the term of the agreement. [Dkt. #281-8]. How such materials were withheld from discovery for nearly a year and a half is unfathomable. BDTCB doesn't have much of an explanation, saying only

that they were withheld based on "initial, good-faith view that these documents were unresponsive." "Unfortunately ... saying so ... doesn't make it so." *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010). Then, miraculously, they were produced seventeen months late when BDTCB alleges it "retraced its steps for thoroughness." [Dkt. # 328, at 9-10].

Then there are the emails from TCB's CEO. As already noted, he is the one who claimed in essence he didn't understand how to institute a litigation hold or how his own company's automatic deletion protocol worked or even the period of time that it covered. Any errors, he claimed were the result of his good faith misunderstandings. A quarter of his emails were produced in August 2018 – again, slow and late. Capital Premium points out that the production raised some questions about BDTCB's search methods (again). For example, two emails that the CEO forwarded to his home account from his TCB account were included in his personal account production, but not his TCB account production. BDTCB writes this off as the result of "reasonable limitations" in the company's (alleged) technical ability. [Dkt. #329, at 11]. So, if one blindly accepts all that BDTCB says, its position is there should be no sanctions because BDTCB is just really inept at discovery. (They conveniently ignore the absurdity of the claim to say nothing of being represented by two major and enormously experienced law firms) They did, they say, the best they could; that apparently is the ultimate claim against the imposition of the sanctions that the defendant seeks.

### B.

Given all this, sanctions are clearly appropriate. But, judges must tailor sanctions to the severity of a party's misconduct. *Nelson v. Schultz*, 878 F.3d 236, 238–39 (7th Cir. 2017); *Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 515 (7th Cir. 1997). The harshest sanction, of course, is dismissal/default judgment, which is exactly what Capital Premium wants. I stopped short of recommending the harsher sanctions Capital Premium wanted the last time BDTCB's misconduct was brought to the court's attention. It remains to be seen what Judge Lee will do; as already noted, Capital Premium has objected to my recommendation of a lesser sanction and both the report and recommendation and Capital Premium's objection remain pending. All this may end up being a moot point should Judge Lee be convinced by Capital Premium's objections. Moreover, should Judge Lee choose a lesser sanction, there would be no reason to duplicate it here. As

such, not much more than musings on the possible severity of sanctions can be offered here.

A court can apply the sanction of dismissal for Rule 37 violations with a finding of "willfulness, bad faith, or fault." *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 191 (7th Cir. 2011). A finding of fault does not require intentional or reckless behavior, but "suggests unreasonable behavior," and it "does not include conduct that we would classify as a mere mistake." *Long v. Steepro*, 213 F.3d 983, 986 (7th Cir. 2000). For example, the Seventh Circuit has upheld the sanction of dismissal where the district court found "a pattern of 'willful delay and avoidance.' " In that event, "the Rule 37 standard of willfulness, bad faith, or fault" was met. *Brown*, 664 F.3d at 191.

**\*6** Willful delay and avoidance is the pattern that has been recounted here, not to mention bad faith. BDTCB has either ignored or failed to fully comply with multiple discovery Orders. It has failed to meet multiple court-ordered discovery deadlines, as well as automatic deadlines under the Federal Rules of Civil Procedure and to honor promises to opposing counsel. This isn't a record of missing a single deadline, as occurred in *Long v. Steepro*, 213 F.3d 983, 985-87 (7th Cir. 2000) on which BDTCB relies. [Dkt. # 328, at 13]. It's not just a "mere mistake." *Long*, 213 F.3d at 987. Based on objective performance, BDTCB has simply not taken Fed.R.Civ.P. deadlines, court-ordered deadlines, or discovery obligations seriously. It is behavior that has not been sporadic; as recounted here, it's been a pattern. *Pendell v. City of Peoria*, 799 F.3d 916, 917–18 (7th Cir. 2015)("Factors relevant to the decision to dismiss include the plaintiff's pattern of and personal responsibility for violating orders....."). Repeated failures to meet deadlines – especially court-ordered deadlines – support the harshest sanction of dismissal/default judgment. *See Aura Lamp & Lighting, Inc. v. International Trading Corp.*, 325 F.3d 903, 904–906 (7th Cir. 2003).

BDTCB, of course, has a multiplicity of excuses for its discovery failures and violations that it feels should immunize it from the harshest of sanctions. It points to the claimed ineptitude of its electronic search efforts as one excuse for avoiding responsibility for its discovery violations. [Dkt, #328, at 13]. That claim does not ring true. In any event, their sheer number of missteps are not only inexcusable, but their number and setting make unacceptable the conclusion that they were anything but purposeful and strategic. In isolation, perhaps one of the facts described by BDTCB might conceivably be dismissed

as a mere blunder. But considering the evidence in total, it more than represents the sort of intentional circumstances that are alarming. Indeed, "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *Coggeshall v. United States* 69 U.S. (2 Wall.) 383, 17 L.Ed. 911 (1865).

Facts are not to be considered in isolation, and what a fact finder "is permitted to infer from the evidence in a particular case is governed by a rule of reason." Judges, like other fact finders, may properly " 'use their common sense' " and " 'evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings.' " *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989). What Justice Cardozo said in *In re Elm St in City of New York*, 246 N.Y. 72, 158 N.E. 24 (N.Y. 1927) applies to BDTCB's insistence that its conduct was but an unconnected series of unintentional mishaps: "If we may not say of such a coincidence that it is literally impossible, at least we may say that one would be surprising, and several would be marvelous."

Beyond that, mistake doesn't account for a party's own personal informal stay of discovery or broken promises to opposing counsel. It is no answer to say that BDTCB has been busy: busy filing briefs and busy complying with Local Rule 37.2. [Dkt.#328, at 7-8, 8-9 13, 14]. The claim is not credible, and in any event "it is widely accepted that neglect due to a busy schedule is not excusable." *Harrington v. City of Chicago*, 433 F.3d 542, 548 (7th Cir. 2006); *see also United States v. Cates*, 716 F.3d 445, 449 (7th Cir. 2013)*; Keeton v. Morningstar, Inc.*, 667 F.3d 877, 883 (7th Cir. 2012). The excuse rings even more hollow when those making it filed the case and are represented by distinguished law Firms that are among the most distinguished in the country. Thus, the record here does not and would not support a claim of "clumsy lawyering," *Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018), even if one had been made.

When BDTCB lists the distractions that they claim have taken them off-task, the excuse cannot be taken seriously. For example, BDTCB reminds us that it "request[ed] an *in camera* review of [Capital Premium's] excessively redacted communications." [Dkt. #328, at 7]. The brief supporting that request was just seven pages long, and was filed almost two months after the bungled electronic search. [Dkt. #264]. Moreover, the redactions were found to be, in the main, proper

and, of course, the burden in terms of time-consuming review fell almost entirely on the court. So that's an unpersuasive excuse.

**\*7** It gets worse, however. While BDTCB complains that it had to do "extensive briefing required by [Capital Premium's] spoliation motion," [Dkt. # 328, at 7], the spoliation motion was occasioned by TCB's misconduct, and it is fundamental that no one can "found any claim upon his own inequity or take advantage of his own wrong." *R.H. Stearns Co. of Boston, Mass., v. United States*, 291 U.S. 54, 61–62, 54 S.Ct. 325, 78 L.Ed. 647 (1934). *See also Reynolds v. Sims*, 377 U.S. 533, 630, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). And, the one brief BDTCB had to file was finished February 16, 2018, well in advance of most of the discovery violations at issue here.

As for having to confer with opposing counsel over discovery disputes and being urged by the court to comply in good faith with Local Rule 37.2, BDTCB has the wrong idea. It claims that these conferences were the product of the court "urg[ing] the parties to work cooperatively in completing document discovery" – imagine that – and that these repeated conferences somehow contributed to BDTCB failing to get discovery production done on time and in compliance with court orders. [Dkt. # 328, at 14 (quoting *City of Rockford v. Mallinckrodt ARD Inc.*, 326 F.R.D. 489, – (N.D. Ill. 2018) ) ("... 254, [c]ourts cannot preach party cooperation and then unilaterally reject the process the *parties agreed upon.*") ] (Emphasis supplied).

But this is not a situation in which sanctions are sought for BDTCB's *compliance* with a mutually agreed upon (or ordered) plan of discovery. That, of course, would be fundamentally unfair and prohibited in any context. The requirement that parties in litigation attempt to work cooperatively could not be more basic to the operation of the Federal Discovery Rules, as every court in the country has recognized. *See, e.g., Ayoubi v. Dart*, 724 F. App'x 470, 473 (7th Cir. 2018); *Nelson v. Schultz*, 878 F.3d 236, 239 (7th Cir. 2017); *Schindler v. Renaissance Hotel Mgmt. Co., LLC*, 639 F. App'x 377, 378 (7th Cir. 2016)(the district court "directed [the plaintiff] to cooperate with opposing counsel, reminding him that he 'initiated this lawsuit and is expected to cooperate with discovery and appear in court as ordered.' "); *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 560 (7th Cir. 2008); *Allno Enterprises, Inc. v. Baltimore Cty., MD*, 10 F. App'x 197, 203 (4th Cir. 2001); *Mills*, 259 F.R.D. at 130 ("The civil discovery process is to be engaged in cooperatively."); *Wagner v. St. Paul Fire & Marine Ins. Co.*, 238 F.R.D. 418,

422 (N.D.W. Va. 2006) (observing that "[ g]amesmanship" in discovery "is not allowed"); M.D.N.C. LR 26.1(b)(1) ("The Court expects counsel to conduct discovery in good faith and to cooperate and be courteous with each other in all phases of the discovery process.").

The evidence simply does not support BDTCB's contention that any infractions were really traceable to the fault of the court and its attempt to have the lawyers act cooperatively. While it is true that the court had to remind the parties of their basic obligations in discovery [Dkt. ## 142, 322] and, when that was not enough, had to actually supervise the parties' discovery conferences, [Dkt. ## 167, 241, 254, 255], it is odd and unavailing to suggest significant misconduct should be insulated from sanctions because the litigation, itself, is onerous and demanding. What a curious inversion. [6]

**\*8** Finally, engaging in a bit of "whataboutism", BDTCB points an accusatory finger at Capital Direct, arguing that it has been no angel in discovery. [Dkt. #328, at 11]. Court intervention in one discovery squabble after another, not to mention supervision of discovery conferences, certainly suggests this is the case and Capital Premium does not deny it. [Dkt. # 334]. But while Capital Premium's transgression merit a couple of paragraphs in BDTCB's response brief [Dkt. # 328, at 11-12], BDTCB have warranted multiple discovery motions, two sanctions motions and multiple court interventions and rulings. So, there is a significant difference – certainly enough of a difference that BDTCB can't slough off its violations by pointing at the opponent.

## C.

There are a number of factors the Seventh Circuit has said ought to be considered before the ultimate sanction of dismissal/default should be imposed: they include the prejudice to other litigants and their lawyers from noncompliance, the possible efficacy of lesser sanctions, and any demonstrated merit to the suit. *Pendell*, 799 F.3d at 917–18.

Prejudice here is clear – not only to Capital Premium, but to those litigants and their lawyers in other cases who require the court's attention. Every hour consumed administering needless or unnecessary discovery disputes is an hour taken from other litigants, who must wait in a longer queue for judicial attention. Unnecessary complaints sap the time of judges, forcing parties with substantial disputes to wait in a

longer queue and condemning them to receive less judicial attention when their cases finally are heard. *See Channell v. Citicorp Nat. Services, Inc.*, 89 F.3d 379, 386 (7th Cir. 1996); *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1077 (7th Cir. 1987); *Kasper v. Board of Election Com'rs of the City of Chicago*, 814 F.2d 332, 341 (7th Cir. 1987). *Cf. Smoot v. Mazda Motors of America*, 469 F.3d 675, 677 (7th Cir. 2006). *See also* the discussion in *Chapman v. First Index, Inc.*, 796 F.3d 783, 787 (7th Cir. 2015); *City of Greenville, Ill. v. Syngenta Crop Prot.*, LLC, 764 F.3d 695, 697 (7th Cir. 2014).

The efficacy of lesser sanctions cannot actually be determined as no actual sanction has as yet been imposed on BDTCB. But BDTCB has been operating with at least a report and recommendation hanging over their heads, and it has not seemed to have much of an effect. "Moreover, despite the severity of the sanction, a court is not required to issue less severe sanctions before deciding to enter default judgment (or to dismiss the case)." *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 779 (7th Cir. 2013)(parentheses in original), *rev'd on other grounds*, ––– U.S. ––––, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015). *Accord Fuery*, 900 F.3d at 464. Neither is a warning required in every case. "[T]he warning requirement is not a 'rigid rule. It was intended rather as a useful guideline to district judges—a safe harbor to minimize the likelihood of appeal and reversal.' " *McMahan v. Deutsche Bank AG*, 892 F.3d 926, 932 (7th Cir. 2018). *See also Fuery*, 900 F.3d at 464; *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 562 (7th Cir. 2011); *Brown*, 664 F.3d at 192 ("More recent case law, however, has clarified that an explicit warning is not absolutely necessary; rather, the language in *Ball* [2 F.3d 752, 760 (7th Cir. 1993) ] should be taken as a *guideline* for district court judges and should be treated as a safe harbor rather than a requirement.") (Emphasis supplied); *Fischer v. Cingular Wireless, LLC*, 446 F.3d 663, 665 (7th Cir. 2006). *See also Fuery*, 900 F.3d at 464. In short, the inflexible rule advocated by BDTCB does not, if it ever did, express the governing principles. *See also Evans v. Liberty Ins. Corp.*, 702 F. App'x 297, 300 (6th Cir. 2017)("A district court is permitted to dismiss a complaint as 'the first and only sanction, solely on the basis of the plaintiff's counsel's neglect' and is not required to 'incant a litany of the available lesser sanctions.' ").

**\*9** The fact that an explicit warning is not required is important in view of the fact that often, judges refer supervision of discovery to magistrate judges who, of course, have no authority to dismiss a case or enter default judgment as a sanction. As such, the question is whether a warning

from a magistrate judge as to what the judge might do might understandably fall on deaf ears and not qualify as a warning at all under cases like *Ball.* We know that here magistrate judge-ordered deadlines seem to have fallen on deaf ears more than once. They certainly were not taken seriously.

There is no need to warn that dismissal may be coming when, as here, the defendant files a motion with notice to the plaintiff asking for dismissal. In such a situation, the plaintiff has an opportunity to explain itself by responding to the motion. If, after hearing from both sides, the district court believes dismissal is appropriate, no purpose would be served by issuing a warning: the motion itself was the warning. *Cf. Johnson v. Kamminga*, 34 F.3d 466, 468 (7th Cir. 1994) (rejecting a warning requirement that "would in effect be granting each litigant one opportunity to disregard the court's schedule without fear of penalty"). *See McMahan v. Deutsche Bank AG*, 892 F.3d 926, 932–33 (7th Cir. 2018); *Hal Commodity Cycles Management Co. v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir. 1987)("A district court is not required to fire a warning shot."); *Serritella v. Markum*, 119 F.3d 506, 512 (7th Cir. 1997).

Importantly, for the situation here, the Seventh Circuit has also stated that a warning need not even come from a judge. In *Fischer*, the court took specific note of the fact that the defendant had made a request that the plaintiff's suit be dismissed if the defendant continued to miss deadlines. The court said this deserved particular emphasis because "[t]he purpose of requiring a warning is not to entrap district judges but to make sure that the plaintiff is warned. The warning need not (despite a contrary suggestion in *Kruger v. Apfel*, ...) always come from the judge." *Fischer*, 446 F.3d at 666. *See also Brown*, 664 F.3d at 192 ("Further, a warning of dismissal need not come from the judge."). Here, Capital Premium has requested the ultimate sanction of dismissal/ default judgment in two separate motions and one set of objections to the pending report and recommendation. There is no way BDTCB can say it didn't see this coming.

Demonstrated merit to the suit is a difficult gauge to employ in a case where discovery is ongoing. But, we do know that Judge Lee has denied BDTCB's motion to dismiss counts VII and VII of Capital Premium's Second Amended Complaint, and Judge Gottschall denied BDTCB's motion for Partial Summary Judgment [Dkt. # 77], and both decisions went to the merits of those motions and the case. And, Judge Gottschall granted Capital Premium's motion for a preliminary injunction against BDTCB taking certain actions

under the Master Transaction Agreement. [Dkt. ## 164, 165]. On the other side of the coin, Judge Lee struck Capital Premium's motion for partial summary judgment [Dkt. # 201], but that was simply because discovery was ongoing. [Dkt. #208]. To the extent anything can be taken from the judges' rulings on the substantive motions in this case thus far, the demonstrated merit factor does not favor BDTCB.

So again, BDTCB's litany of excuses all come down to a plea not to sanction them because this case was so complicated and involved so much effort that whatever infractions were committed by BDTCB stemmed from the good faith attempts to litigate the case properly it was really beyond the good faith ability of BDTCB to handle. In BDTCB's view there were just too many documents to efficiently sift through and too many demands for the litigation to be handled as effectively as BDTCB would have liked. That the litigation was initiated by Capital after, as its labyrinthine Complaint demonstrates, a good deal of thought and analysis, didn't count. Other excuses abound. BankDirect's IT department wasn't much good at conducting computer searches. TCB's CEO didn't have any idea what his company's document retention protocols were. And counsel were just really busy throughout this case with motion practice. It is almost embarrassing saying that these sophisticated companies and their even more sophisticated lawyers subtly try to compare themselves to the *pro se* litigant in *Long*, the case they rely on extensively in the hopes of avoiding responsibility for their long list of failures [Dkt. # 328, at 12-13]. But, the plaintiff in *Long* did not make one blunder after another, miss one deadline after another, or violate more than one court order. He made *one* mistake. As the Seventh Circuit said:

> **\*10** Mr. Long, proceeding *pro se*, prosecuted his complaint without incident for over one year. He timely answered discovery requests served on him, responded in a timely fashion to the defendants' motion for summary judgment, and properly requested leave of court when he sought to amend his complaint. Mr. Long's only misstep was his failure to file his evidentiary lists by the deadline set in the Scheduling Order.

213 F.3d at 986. Clearly, BDTCB's performance falls far short of the standard Mr. Long set.

BDTCB didn't simply make a mistake – or even a few mistakes, and what is involved here is not mere "clumsy lawyering." *Fuery*, 900 F.3d at 464. Rather, BDTCB's conduct was purposeful and repeated. It compounded its now claimed ineptitude and innocence by stalling and dragging its feet and waiting to the last minute to perform searches and review documents. If it were a matter of a blunder here, or a technical challenge there, their excuses might be acceptable, for "[m]ere clumsy lawyer is not enough." *Id.* Any one violation of their discovery obligations might not seem to be much. And even an isolated violation or two may not warrant the sanction sought by the defendant. But, BDTCB's violations are not episodic and cannot be viewed in isolation. *Fuery* teaches that it is for the district court to evaluate what occurred and determine whether the incremental blows to the integrity of the process warrant the sanction imposed. "Death by a thousand cuts" is still death, and it is "no less severe than death by a single powerful blow." *Fuery.*

The Seventh Circuit's summation in *Fuery v. City of Chicago* applies here:

> The plaintiffs counter the district court's catalogue of infractions by attempting to unravel each violation and demonstrate its inconsequential nature. And, in fact, when explained by the plaintiffs in this way, many of the violations may seem trivial (others, however, not at all). But once again, it is the district court who can evaluate the whole ball of wax and determine whether the small incremental blows to the integrity of the trial add up to something that requires sanctioning. Death by a thousand cuts is no less severe than death by a single powerful blow.

900 F.3d at 464.

## CONCLUSION

It is recommended that Capital Premium's second motion for sanctions be granted. While the facts arguably allow for the harshest of sanctions, the severity of the sanction will necessarily be dependent upon Judge Lee's resolution of the pending report and recommendation on spoliation sanctions and Capital Premium's objections thereto.

**All Citations**

Slip Copy, 2018 WL 6694904

Footnotes

1   Discovery in this three-year-old case has been arduous for everyone. It has necessitated near-constant court intervention and supervision. [Dkt. ## 130, 135, 138, 142, 167, 170, 173, 185, 207, 209, 212, 223, 224, 225, 227, 229, 231, 239, 241, 252, 254, 255, 256, 262, 263, 264, 267, 270, 271].

2   While reading BDTCB's response brief, the perfect musical accompaniment might be Frank Sinatra's recording – or, if you prefer, Chet Baker's – of Tom Adair and Matt Dennis's "Everything Happens To Me":

> Black cats creep across my path until I'm almost mad.
> I must have roused the Devil's wrath 'cause all my luck is bad.
> I make a date for golf and you can bet your life it rains.
> I try to give a party but the guy upstairs complains.
> I guess I'll go through life just catchin' colds and missin' trains.
> Everything happens to me.

3   Even at that, given the overly contentious path discovery has taken in this case, it is difficult to weave together an unassailably accurate tapestry from all the threads that come from the many disputes, conferences, hearings, etc. But even through the fog of discovery war, a pattern is evident, and that will serve as the basis for this Report and Recommendation.

4   During all this time, the plaintiff and its largest shareholder, who is also a party in the case, were represented by two of the most experienced law firms in the country which proudly and publically boast of their skills and involvement in complex nationwide cases.

5   The concept of what Wigmore called trial by ambush was long ago replaced by rules of discovery in both state and federal courts. The rules seek to facilitate open and even-handed development of the relevant facts. Modern discovery rules regard secrecy as uncongenial to truth seeking and trial by ambush as destructive of the overarching goal that cases be justly determined on their merits. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Thus, lawyers have a duty to act in good faith in complying with their discovery obligations and to cooperate in and facilitate forthright discovery. *Johnson v. J.B. Hunt Transport, Inc.*, 280 F.3d 1125, 1132 (7th Cir. 2002).

6   BDTCB's reliance on *Rockford v. Mallinckrodt* is misplaced. The quote that BDTCB selected, out of context, indicated that, because the court allowed the parties in that case to choose keyword searching rather than technology-assisted review, it would not force technology-assisted review onto the parties. Moreover, the docket in *Mallinckrodt* (18-cv-379) demonstrates that it has nothing to do with this case: no court-supervised discovery conferences, no motions to compel, seemingly no disputes over discovery other than whether sampling the null set was reasonable. True, the case was in its early phase compared to this one, but it would appear to be a far more complicated matter.

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

IDC Financial Publishing, Inc. v. Bonddesk Group, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4863202

2017 WL 4863202
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

IDC FINANCIAL PUBLISHING, INC., Plaintiff,

v.

BONDDESK GROUP, LLC, et al., Defendants.

Case No. 15–cv–1085–pp
|
Signed 10/26/2017

**Attorneys and Law Firms**

David R. Konkel, John L. Kirtley, Paul F. Heaton, Matthew M. Wuest, Godfrey & Kahn SC, Milwaukee, WI, for Plaintiff.

Michael A. Kleinman, Peter L. Simmons, Fried Frank Harris Shriver & Jacobson LLP, New York, NY, Jennifer A. Kenedy, Julia C. Webb, Locke Lord LLP, Chicago, IL, for Defendants.

**ORDER GRANTING THE PLAINTIFF'S MOTION TO RESTRICT DOCUMENTS (DKT. NO. 45) AND GRANTING THE PLAINTIFF'S CIVIL L.R. 7(h) NON–DISPOSITIVE MOTION TO COMPEL (DKT. NO. 46)**

PAMELA PEPPER, United States District Judge

*1 On September 7, 2017, the plaintiff filed two motions: (1) a Civil L.R. 7(h) expedited, non-dispositive motion to compel production of un-redacted documents, dkt. no. 46; and (2) a motion to restrict documents submitted in support of the motion to compel, dkt. no. 45. The defendants join in the plaintiff's motion to restrict documents, dkt. no. 48, and filed their response in opposition to the plaintiff's motion to compel on September 14, 2017.

1. Underline The Plaintiff's Motion to Restrict Documents (Dkt. No. 45)

The plaintiff's motion seeks to restrict from public view portions of Exhibits A, D, E, F, G, H, I, J, K, L and M, which are attached to John Kirtley's declaration in support of the plaintiff's Civil L.R. 7(h) motion to compel. Dkt. No. 47. The plaintiff states that "these documents and declaration should be sealed because they reference, describe, and quote from documents and information that TradeWeb has designated as CONFIDENTIAL or ATTORNEYS EYES ONLY" under

the court's February 15, 2016 protective order (dkt. no. 30). The Seventh Circuit, however, has held that courts should not restrict documents solely because the parties have agreed to restrict them: "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." In re Specht, 622 F.3d 698, 701 (7th Cir. 2010) (citing Baxter Int'l, Inc. v. Abbott Laboratories, 297 F.3d 544 (7th Cir. 2002)).

In their request to join the plaintiff's motion, the defendants more specifically detail the sensitive nature of the documents. Dkt. No. 48. They state that the materials to be restricted include "drafts of contracts between Tradeweb and its customers and ... internal Tradeweb comments concerning negotiations of one of those contracts. [Certain Exhibits] relate to the specific customizations of the functionality of Tradeweb's electronic platform to meet the specific trading needs of individual customers." Dkt. No. 48 at 2. They allege that the documents "contain commercially sensitive, non-public, and proprietary business information relating to Tradeweb's business and its relationship with numerous of its customers." Id. at 1. They assert that disclosure of the information in the documents "would be commercially harmful to Tradeweb's relationship with its customers, and "would ... provide unwarranted access to competitively sensitive information to Tradeweb's competitors and to competitors of its customers[.]" Id. at 2.

The court finds that the defendants have stated good cause to restrict the documents, and the court will grant the motion.

2. Underline The Plaintiff's Civil L.R. 7(h) Motion to Compel (Dkt. No. 46)

The plaintiff's motion to compel seeks production of un-redacted documents from the defendants. Specifically, the plaintiff alleges that while defendant TradeWeb has produced more than 6,000 documents in discovery, the plaintiffs have found that over 600 of the documents have been "unilaterally redacted." Dkt. No. 46 at 1. The plaintiff states that the redactions are broad; the defendants have redacted nearly all the text in "dozens of emails, contracts, and spreadsheets." Id. The plaintiff says that "there is no debate that the *documents* at issue fall within th[e] scope [of discovery][,]" and argue that the defendants should not be allowed redact large swaths of information in an otherwise responsive document on the ground that the defendants have deemed such information irrelevant. Id. (emphasis in original). The plaintiff notes that the defendant "cannot identify any prejudice from the

WESTLAW

1

IDC Financial Publishing, Inc. v. Bonddesk Group, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4863202

production of unredacted documents[,]" and argues that if the defendants disagree about the relevance of information contained in a document, "an objection is appropriate upon its introduction," rather than large scale redactions at the discovery stage. Id.

**\*2** The defendants respond that the material they have redacted from the documents is not relevant to the case. Dkt. No. 49 at 1. The defendants aver that they have produced all of TradeWeb's discussions with its customers about "whether to include IDC financial strength ratios as a search criteria for CDs[,]" and argue that the parameters of this case do not allow the plaintiffs to peruse and explore all other aspects of the TradeWeb's contractual and financial relationships with its customers. Id. at 2. The defendants argue that the redactions are "necessary to protect business information that is wholly unrelated to IDC's ratings data." Id. at 4. In short, defendants argue that "IDC does not get to probe all of TradeWeb's business dealings just because one contract is at issue." Id.

Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b). Although the 2015 Amendments to Rule 26(b) placed a renewed emphasis on proportionality with regard to discovery requests (see advisory committee notes, 2015 Amendment; Milwaukee Elec. Tool Corp. v. Snap–On Inc., No. 14–CV–1296–JPS, 2017 3130414, at *1 (E.D. Wis. July 24, 2017)), the rule still provides that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." Id. District courts maintain broad discretion in discovery matters. Kuttner v. Zaruba, 819 F.3d 970, 974 (7th Cir. 2016).

The plaintiff submits exhibits with examples of the sorts of redactions that the defendants have performed. For example, exhibit D to the Kirtley declaration shows more than thirty of its thirty-seven pages redacted as "nonresponsive." Dkt. No. 47–6. In exhibit H to the Kirtley declaration, the defendants have redacted pages five through thirty of the document. Dkt. No. 47–14. The defendants have gone beyond the sort-of "line-item" redactions of personal information or account numbers sanctioned by Fed. R. Civ. P. 5.2. Instead, they have blocked out large chunks of information on documents that, by virtue of producing them, they admit are discoverable.

Although the defendants have provided the court with a description of each of the redacted documents through the

declaration of Michael Kleinman, (dkt. no. 50 at 2, ¶ 5), these descriptions do not suffice to cure the extensive redactions. As another district court has found, "[t]he practice of redacting for nonresponsiveness or irrelevance finds no explicit support in the Federal Rules of Civil Procedure, and the only bases for prohibiting a party from seeing a portion of a document in the Rules are claims of privilege and work-product protections." Burris v. Versa Products, Inc., Civil No. 07–3938 (JRT/JJK), 2013 WL 608742, at *3 (D. Minn. Feb. 19, 2013) (citing Fed. R. Civ. P. 26(b)(5)). Further,

> [p]arties making such redactions unilaterally decide that information within a discoverable document need not be disclosed to their opponents, thereby depriving their opponents of the opportunity to see information in its full context and fueling mistrust about the redactions' propriety. And if the Court were to allow such a practice it would improperly incentivize parties to hide as much as they dare. That is a result at odds with the liberal discovery policies, the adversary process, and the Court's obligation to read the Rules 'to secure the just, speedy, and inexpensive determination of every action and proceeding.' Fed.R.Civ.P. 1. None of this is intended to imply that [redacting party] or its counsel attempted to hide the ball here. But because these types of redactions find no support in the Rules and are fraught with the potential for abuse, the Court will not permit them unless the circumstances provide an exceedingly justification to do so.

**\*3** Id.

That potential for abuse exists here. The defendants do not assert any privilege protecting the information they redacted, and object to disclosing the information on a blanket assertion that the redacted information does not apply to the plaintiff. The plaintiffs may disagree with the defendants' relevance determination. See EEOC v. Dolgencorp, LLC, No. 13–cv–04307, 2015 WL 2148394 at *5 (N.D. Ill. May 5, 2015) ("What constitutes relevant information is often a matter of judgment, and even irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information.") (internal quotations omitted). The court does not agree that the plaintiff must "take the defendants' word for it" that the redacted portions of the documents are not relevant to the plaintiff's claim.

More important, the defendants have not provided a compelling reason for the court to allow the extensive redactions. The defendants cite In re: Takata Airbag

**IDC Financial Publishing, Inc. v. Bonddesk Group, LLC, Not Reported in Fed. Supp. (2017)**

2017 WL 4863202

Prods. Liab. Litig., 14–24009–CV–MORENO, 2016 WL 1460143 (S.D. Fla. Feb. 24, 2016), in which a district court in the Southern District of Florida allowed the defendants to redact documents as nonresponsive because of its concern that the documents contained competitively sensitive materials that may have been exposed to the public, despite protective orders. Here, while the defendants state that "Tradeweb's redactions are necessary to protect 'business information that is wholly unrelated' to IDC's ratings data[,]" they make no effort to explain why Judge Randa's February 15, 2016 protective order does not adequately protect the defendants. That protective order explicitly provides that "documents or other information marked as CONFIDENTIAL INFORMATION may be used only in connection with the above-captioned litigation and shall not be disclosed, displayed, shown, made available, or communicated in any way to anyone other than the following [specific exceptions]." Dkt. No. 30 at 3, ¶ 6. The court does not see a compelling reason to alter the traditionally broad discovery allowed by the rules by letting the defendants unilaterally redact large portions of their responsive documents on relevance grounds.

The court **GRANTS** the plaintiff's motion to file as restricted. Dkt. No. 45. The court **ORDERS** that, under General L.R. 79(d), Exhibits A, D, E, F, G, H, I, J, K, L and M to the declaration of John Kirtley (dkt. no. 47) shall be **RESTRICTED** to case participants until further order of the court.

The court **GRANTS** the plaintiff's motion to compel. Dkt. No. 46. The court **ORDERS** that the defendants shall produce an un-redacted version of the documents identified in Exhibits A and B to the Kirtley Declaration, dkt. nos. 47–1, 47–2, no later than the end of the day on November 7, 2017.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4863202

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.